SESSA v MACOMB COUNTY

Docket No. 192569. Submitted July 1, 1996, at Detroit. Decided November 26, 1996, at 9:30 A.M.

Michael Sessa and others, all Macomb County taxpayers, brought suit in the Court of Appeals pursuant to Const 1963, art 9, § 32 against Macomb County and the Macomb County Building Authority, challenging the action of the defendants in issuing limited tax obligation bonds to finance the construction of a court and administrative complex for the county. In March 1995, the Macomb County Board of Commissioners adopted a resolution of an intent to issue bonds and announced its intent that the building authority should sell bonds to cover the cost of constructing and furnishing the building. The bonds were to be backed by the full faith and credit of the county but with the limitation that the source of funds available to pay the bondholders was to be a combination of the county's lease payment to the building authority for the use of the complex and allocations from the county's general fund budget generated from the county's existing 4.2-mill tax rate. The statutory notice, including notice of the right of the citizens to petition for a referendum concerning whether the bonds should be used to finance the project, was published in May 1995. No petition for a referendum was filed within the statutory forty-five-day period. On October 5, 1995, the building authority adopted a resolution authorizing the sale of the bonds, which were eventually delivered to the underwriters on February 5, 1996. The plaintiffs filed their suit in the Court of Appeals on February 9, 1996, seeking to have the bonds declared void because of the absence of a vote of the electorate of Macomb County authorizing the issuance of the bonds. The defendants moved for summary disposition on the bases that the bonds were lawfully issued and that the plaintiffs had not brought their suit in a timely manner.

The Court of Appeals *held*:

1. The bonds that were issued were limited tax obligation bonds that, while issued with the pledge of the county's full faith and credit, impose no obligation on the county to levy additional taxes beyond the tax rates or amounts authorized by law in order to fulfill the repayment obligation.

2. The plaintiffs contend that these limited tax obligation bonds are in violation of the requirement of Const 1963, art 9, § 31 that any increase in an existing tax rate above the rate authorized by law or charter may not be imposed without the approval of the electorate of the affected local unit of government, because upon any default of those bonds that resulted in a judgment of damages against the county, the county could issue judgment bonds pursuant to MCL 600.6097(1); MSA 27A.6097(1) that could result in the levying of a tax rate above the rate authorized by law or charter. That contention is without merit. Because § 6097(1) specifically makes issuance of judgment bonds by a municipality possible only "unless otherwise provided," the issuance of any judgment bonds under that section can be made only upon satisfaction of the provisions of Const 1963, art 9, § 31, including the need for voter approval if the tax rate needed to pay the judgment bonds would exceed the tax rate authorized by law or charter.

3. Because the county's obligation with respect to the repayment of the bonds is contractual in nature, the limitation with respect to the source of funds that may be looked to for repayment of the bonds contained in the bonds that were issued is not illusory.

4. Although the plaintiffs' suit was brought not only within one year of the issuance of the bonds, but also within one year of the adoption of the resolution of the intent to issue the bonds, and thus is not barred by the one-year limitation period of MCL 600.308a(3); MSA 27A.308a(3), the plaintiffs' action nevertheless was not timely because the plaintiffs, although being aware of the pending sale of the bonds, did not act promptly, but rather waited until after the sale of the bonds to act.

5. Const 1963, art 9, § 31 does not prohibit every issuance of bonds by local units of government without voter approval; rather it requires voter approval of a bond issue where the issuance would result in a tax rate above the tax rate authorized by law or charter on the date Const 1963, art 9, § 31 took effect. Because the plaintiffs have not shown that these limited tax obligation bonds will result in a tax rate above the existing authorized tax rate, their complaint is without merit, and the defendants are entitled to a judgment of no cause of action.

Judgment of no cause of action for the defendants.

MARKMAN, J., concurring, stated that although the defendants are entitled to a judgment of no cause of action because these limited tax obligation bonds are not contrary to the language of Const 1963, art 9, § 31, such bonds are contrary to the intent of the drafters of the Headlee Amendment, which added art 9, § 31 to the

Michigan Constitution, and are contrary to the common under-
standing of the people in adopting that amendment.

1. BONDS — MUNICIPAL CORPORATIONS — JUDGMENT BONDS — VOTER APPROVAL
— CONSTITUTIONAL LAW.

Judgment bonds issued by a local unit of government in order to sat-
isfy a judgment against the local unit are subject to the provision of
the Michigan Constitution that requires voter approval of any bond
sale that will result in an increase in the tax rate above that author-
ized by law or charter on the date of the adoption of the constitu-
tional provision (Const 1963, art 9, § 31; MCL 600.6097[1]; MSA
27A.6097[1]).

2. BONDS — MUNICIPAL CORPORATIONS — LIMITED TAX OBLIGATION BONDS —
VOTER APPROVAL — CONSTITUTIONAL LAW.

Bonds issued by a local unit of government for which the source of
repayment is limited to funds available from a budget generated by
an existing authorized tax rate are not subject to the provision of
the Michigan Constitution that requires voter approval of any bond
sale that will result in an increase in the tax rate above that author-
ized by law or charter on the date of the adoption of the constitu-
tional provision (Const 1963, art 9, § 31).

3. BONDS — ACTIONS — CONSTITUTIONAL LAW — PROMPTNESS.

A suit brought pursuant to Const 1963, art 9, § 32 that challenges the
validity of bonds issued by a local unit of government, even if
brought within the applicable one-year period of limitation, may
nevertheless be deemed untimely if the plaintiff does not act
promptly and waits until the bonds have been sold where the plain-
tiff is aware of the sale of the bonds before the date the bonds are
sold (MCL 600.308a[3]; MSA 27A.308a[3]).

*Ronald Chapman*, for the plaintiffs.

*Pollard & Albertson, P.C.* (by *Dennis R. Pollard*
and *Mark K. Schwartz*), for the defendants.

Before: SAAD, P.J., and WAHLS and MARKMAN, JJ.

SAAD, P.J. Plaintiffs are Macomb County taxpayers[1]
who invoke this Court's original jurisdiction pursuant

---

[1] Plaintiff Sessa is also chairman of the Macomb County Taxpayers
Association and a member of the Macomb County Board of Commission-
ers, Sessa has proper standing to prosecute this action as a taxpayer; his

to Const 1963, art 9, § 32, and challenge the action of defendants in issuing limited tax obligation bonds to finance construction of a court and administrative complex for Macomb County at its county seat in Mt. Clemens.

### FACTS

Over the past eight years, the Macomb County Board of Commissioners planned for the construction of a court and administrative complex to be located in downtown Mt. Clemens. The land for the project was acquired, and demolition of certain structures was completed by 1994. On the basis of the space needed, the board of commissioners concluded that the actual construction costs should be financed by the issuance of bonds.

Pursuant to Const 1963, art 9, § 6, the approved level of ad valorem taxes in Macomb County for all purposes is fifteen mills. Pursuant to the allocation made by the Macomb County Tax Allocation Board under MCL 211.211; MSA 7.71, the county's share of the 15 mills is 5.19 mills. However, because property values have increased faster than general inflation, the "General Price Index" clause of the Headlee Amendment, Const 1963, art 9, § 31, has meant a rollback in the authorized tax rate to 4.7431 mills. MCL 211.34d; MSA 7.52(4). Of its authorized 4.7431 mill tax rate, the board of commissioners has elected to levy 4.2 mills for general operating purposes.

status as head of an organization of taxpayers would not alone confer such standing and has been ignored in adjudicating this case. *Grosse Ile Committee for Legal Taxation v Grosse Ile Twp*, 129 Mich App 477, 487; 342 NW2d 582 (1983).

On the basis of general economic and population growth in Macomb County, the board of commissioners projected that, by borrowing the money to construct the planned judicial and administrative complex, the cost of construction could be fully amortized over a ten-year period without increasing the tax levy above the current 4.2 mills. Accordingly, the board of commissioners adopted a resolution of intent to bond on March 23, 1995, and announced its intent to have the Macomb County Building Authority actually undertake construction of the project, lease the complex to the county, and sell bonds to finance the construction and furnishing of the complex. The bonds would be backed by the full faith and credit of the county, with the specified limitation that the revenue to pay the bondholders would come from a combination of lease payments received from the county and allocations from the county's general fund budget within its authorized 4.2-mill limitation.

The statutorily required notice of intent was published in The Macomb Daily, a newspaper of general circulation in Macomb County, on May 10, 1995. MCL 123.958b; MSA 5.301(8b). This notice advised Macomb County citizens of their right to petition for a referendum concerning the question whether this means of financing should be undertaken. The county clerk received no petitions calling for a referendum within the statutorily allowed forty-five-day period for presenting such a challenge. MCL 123.958b(3); MSA 5.301(8b)(3).

On October 6, 1995, the building authority adopted a resolution authorizing the sale of the bonds to finance the project. The amount of the bonds authorized was fixed not to exceed $16.425 million. Bids for

the bonds were received and opened on January 23, 1996; the building authority made its award to the successful bidder on January 25, 1996. On February 5, 1996, the transaction was closed by delivering the bonds in the amount of $12,000,000 in exchange for receipt of the loan proceeds.

After the underwriters paid cash equivalents for the bonds and the bonds were sold on the open market, this action was filed on February 9, 1996.

### ANALYSIS

The bonds, on their face, are designated as "limited tax obligation bonds." As compared with the numerous other forms of public obligation bonds recognized in Michigan jurisprudence, including general obligation bonds, revenue bonds, and tax increment financing bonds, *Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich 93; 422 NW2d 186 (1988), limited tax obligation bonds are structured such that the source of repayment is limited to the general fund revenues of the issuing public authority, including ad valorem taxes and other unrestricted revenue sources. See *Advisory Opinion on Constitutionality of 1976 PA 295, 1976 PA 297*, 401 Mich 686, 710-711; 259 NW2d 129 (1977). Significant to plaintiffs' constitutional challenge to the issuance of bonds to finance this building, the pledge of the county's "full faith and credit" in this context, *imposes no obligation on the county to levy additional taxes*, beyond the rates or amounts authorized by law, in order to fulfill the repayment obligation to the bondholders. In this regard, a bond is a contract, *State Hwy Comm'r v Detroit City Controller*, 331 Mich 337; 49 NW2d 318 (1951); and in this contract the county has limited its

undertaking with respect to the obligation of repayment. This contrasts with general obligation or special assessment bonds backed by the full faith and credit of a municipality, which signify an undertaking to "levy a tax on all taxable property in the [municipality] for the payment of principal and interest on the bonds without limitation as to rate or amount and in addition to all the other taxes which the [municipality] may be authorized to levy." MCL 41.735; MSA 5.2770(65). *Pleasant Ridge v Royal Oak Twp*, 328 Mich 672; 44 NW2d 333 (1950).

Because the bonds that were issued were limited tax obligation bonds, we may dispose of the frivolous contention made by plaintiffs that such limitation is ineffectual by virtue of § 6097(1) of the Revised Judicature Act, MCL 600.6097(1); MSA 27A.6097(1). RJA § 6097(1) provides generally that if a judgment is rendered against any municipality (as after a suit by bondholders following a default), the legislative body of that municipality may issue certificates of indebtedness or bonds of that municipality for the purpose of raising money to pay the judgment. This argument fails for two reasons. One, if such bonds would cause the municipality to exceed its authorized rate of taxation, Const 1963, art 9, § 31 would preclude issuance of such bonds without prior approval by the electorate. Indeed, RJA § 6097, as amended by 1984 PA 393, effectively incorporates this constitutional limitation by explicitly stating that such authorization grants permission to issue such bonds "unless otherwise provided."

With regard to plaintiffs' constitutional challenge, a bond is a contract between the bondholder and the issuing public authority, and a bondholder, as obligee,

cannot demand any remedy or enforcement mechanism for fulfillment of the obligation greater than the undertaking of the contract itself. *Keefe v Clark*, 322 US 393; 64 S Ct 1072; 88 L Ed 1346 (1944). Accordingly, plaintiffs' argument that the limitation of the county's repayment obligation to existing general revenues is illusory is incorrect, and, for this reason, its challenge must fail under art 9, § 32.

This is an original action brought pursuant to Const 1963, art 9, § 32, which invokes this Court's jurisdiction as of right. It is to be noted that this action was commenced within one year not only of the issuance of the bonds themselves, but also of the adoption of the resolution of intent to bond. Accordingly, the present action is not barred by the one-year period of limitation established in § 308a(3) of the Revised Judicature Act, MCL 600.308a(3); MSA 27A.308a(3).

Nonetheless, we agree with defendants that the action is barred by a related preclusive doctrine established in *Bigger v Pontiac*, 390 Mich 1, 4-5; 210 NW2d 1 (1973). *Bigger* dealt with a constitutional challenge to the issuance of public obligation bonds that had been brought before actual issuance and sale of the bonds. There, the suit was deemed untimely because it was not commenced until soon before the planned date of issuance of the bonds and thus would have prevented an orderly process of adjudication. However, the applicability of *Bigger* is broader than this. As interpreted by this Court and the Supreme Court, the rule is designed to deal with challenges that could prevent or frustrate public improvements in general. *Eby v Lansing Bd of Water & Light*, 417 Mich 297, 306, n 10; 336 NW2d 205 (1983); *Langs v Pontiac*, 96 Mich App 639, 642; 293 NW2d 659 (1980).

An equally important aspect of the *Bigger* rule comes into play here where suit was not begun until *after* the bonds had been issued and sold on the open market. The interests of third parties, the bondholders, who are bona fide purchasers for value and who, at the time of purchase, were not on notice of any such challenge, represents a vested interest that the entertaining of such litigation on its merits could defeat. In this regard, therefore, the *Bigger* rule is distinct from the statute of limitations and simply obligates those who would challenge such action to move promptly. *Walled Lake Consolidated School Dist v Commerce Charter Twp*, 174 Mich App 434, 436-437; 437 NW2d 16 (1989).

We note further that the *Bigger* rule, although predating the 1978 Headlee Amendment, Const 1963, art 9, §§ 25-34, is not undermined by those constitutional changes. Nothing in the text of Const 1963, art 9, §§ 25-34 addresses the *Bigger* principle or purports to limit or abolish it in taxpayers suits authorized by Const 1963, art 9, § 32. The Legislature has carefully protected taxpayer interest in this regard, however, in fulfillment of the mandate of Const 1963, art 9, § 34, by requiring notice of intent to bond to be published, MCL 123.958b(3); MSA 5.301(8b)(3). Plaintiffs were obviously on notice of the need to mount their challenge promptly following publication of the May 10, 1995, notice of intent to bond in The Macomb Daily. Further, plaintiff Sessa individually, and as a member of the board of commissioners, was in possession of the requisite notice by virtue of attending the meeting on March 23, 1995, at which the board of commissioners adopted the resolution of intent to bond.

However, even if we declined to apply the *Bigger* rule to bar consideration of this action on its merits, we would find plaintiffs' complaint without merit. In relevant part, Const 1963, art 9, § 31, the constitutional provision on which plaintiffs rely, provides:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of local government voting thereon. . . .
>
> The limitations of this section shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidence of indebtedness or for the payment of assessments on contract obligations in anticipation of which bonds are issued which were authorized prior to the effective date of this amendment.

The amendment was approved at the general election on November 7, 1978, and, pursuant to Const 1963, art 12, § 1, became effective on December 23, 1978. The bonds involved in this case—obviously not being authorized "prior to the effective date of this amendment"—are thus subject to Const 1963, art 9, § 31.

However, there is simply no suggestion that Macomb County, as a "unit of local government," has levied a tax not authorized by law or charter on December 23, 1978, or that it has increased the rate of an existing tax above the rate authorized by law or charter on December 23, 1978, without approval of a majority of the qualified electors of Macomb County voting thereon. Contrary to plaintiffs' assumption that no unit of local government may issue any bond without approval of the electorate, Const 1963, art 9, § 31 merely prohibits units of local government from issu-

ing bonds that require an increase in authorized tax rates to fund the repayment obligation. Nothing in Const 1963, art 9, § 31 prohibits Macomb County either from increasing the existing tax rate of 4.2 mills to the authorized rate of 4.7431 mills to repay these bonds or simply from repaying such bonds out of general revenues within existing tax levies. *Smith v Scio Twp*, 173 Mich App 381, 386; 433 NW2d 855 (1988); *Taxpayers United for Michigan Constitution, Inc v Detroit*, 196 Mich App 463; 493 NW2d 463 (1992); see also *Saginaw Co v Buena Vista School Dist*, 196 Mich App 363; 493 NW2d 437 (1992).

Accordingly, defendants are entitled to a judgment of no cause of action and to tax their costs. It is so ordered.

WAHLS, J., concurred.

MARKMAN, J. *(concurring)*. I concur in the conclusion reached by the majority. However, in my judgment, use by local governments of the limited tax general obligation (LTGO) bond is contrary to the intent of the drafters of the Headlee Amendment and contrary to the common understanding of the people in adopting it.[1] The Headlee Amendment "grew out of the spirit of 'tax revolt' and was designed to place specific limitations on state and local revenues."

---

[1] With regard to the LTGO bond specifically, "the evidence is overwhelming that the supporters of the amendment intended to close the loophole that allowed local governments to obligate the taxpayers and then levy taxes on them to repay the debt—and do so without voter approval." Minority Report (Limited Tax General Obligation Bonds) of Patrick L. Anderson, Report of Headlee Blue Ribbon Commission (September 1994), p 57. While this observation was part of what were otherwise minority views, there is no indication that the majority disagreed with this aspect of Commissioner Anderson's observations.

*Waterford School Dist v State Bd of Ed*, 98 Mich App 658, 663; 296 NW2d 328 (1980); see, also, *Airlines Parking, Inc v Wayne Co*, 452 Mich 527, 532; 550 NW2d 490 (1996), quoting *Durant v State Bd of Ed*, 424 Mich 364, 378; 381 NW2d 662 (1985). "The ultimate purpose [of the Headlee Amendment] was to place public spending under direct popular control." *Waterford School Dist, supra* at 663.

Nevertheless, as the majority correctly observes, the LTGO bond is *not* contrary to the language itself of the Headlee Amendment. In the words of Justice Cooley:

> The object of construction, as applied to a written constitution is *to give effect to the intent of the people in adopting it*. In the case of all written laws, it is the intent of the law-giver that is to be enforced. But this intent is to be found in the instrument itself . . . . "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they [sic] have plainly expressed and consequently no room is left for construction." [Cooley, Constitutional Limitations (Little, Brown and Company, 1868), p 55.]

Because I believe that the LTGO bond, unlike the "full faith and credit" bond, falls outside the scope of the plain language of Const 1963, art 9, § 31, I would hold that it is a constitutionally permissible fiscal device. At the same time, I write separately because I also concur with the Headlee Blue Ribbon Commission that LTGO bonds skirt the edges of the Michigan Constitution:

> LTGO bonds do, in most instances, have the same or greater impact on the total tax burden as voter approved bonds . . . . LTGO bonds do inhibit public awareness of the fiscal situation of the unit issuing such bonds and can

encourage units to incur debt to finance projects that would
not command public support.

$$* \quad * \quad *$$

. . . LTGO bonds inhibit the full realization of the Headlee
Amendment's overall goal of restricting the power of gov-
ernment to increase taxes without the concurrence of the
voters. [Report of Headlee Blue Ribbon Commission (Sep-
tember 1994), § 8, pp 55-56.]

LTGO bonds are largely a post-Headlee Amendment
device designed to allow local governments to carry
out their fiscal affairs on a "business as usual" basis,
unimpeded by the constraints of the Headlee Amend-
ment. It is no accident that there has been an "explo-
sion" in the use of LTGO bonds in the years immedi-
ately following the adoption of the Headlee Amend-
ment, with current estimates that such bonds now
represent approximately eighty percent of both the
number and amount of local bond sales. *Id.* at pp 53,
57.

As envisioned by its drafters, the critical aspect of
the Headlee Amendment is its requirement that local
governments directly obtain the assent of the people
before embarking upon a fiscal course of action that
would increase the involvement of the public sector
at the expense of the involvement of the private sec-
tor. Const 1963, art 9, §§ 25, 31; Report of Headlee
Commission, § 5, pp 22-39. LTGO bonds transform this
process by effectively postponing the vote of the elec-
torate from a time preceding the commitment of pub-
lic resources to a time after such resources have
already been committed. The result is to sharply alter
the significance of an essential procedure under the
Headlee Amendment—the direct vote of the people
with respect to tax increases.

In the case of the issuance of a "full faith and credit" bond, Const 1963, art 6, § 31 requires an express vote of the people concerning whether additional public resources ought to be allocated for a bonded project. The vote is straightforward and unambiguously presents the electorate with a clear choice about the direction of government. The LTGO bond, however, obviates this pre-expenditure vote; instead, the bond is issued and the expenditure occurs absent a vote of the people. Only later, as payments on the principal and interest become due, are the people finally confronted with the fiscal implications of the bonded project. By this juncture, there is no longer an outstanding decision to be made by the people about the project itself; it has already proceeded without their direct approval.

Precisely because bonds need to be issued for their financing, bonded projects typically are substantial capital projects that necessitate hard decisions about fiscal priorities. Such projects ordinarily cannot be accommodated through minor tinkering with other components of the budget. Either decisions about such fiscal priorities will occur at a point when the people have a meaningful opportunity to approve or disapprove of the bonded project or such decisions will occur when the only practical options are to reduce substantially expenditures already contained in the budget or to increase taxes. The LTGO bond moves the point of decision making from the former to the latter. In addition, the vote mandated by the Headlee Amendment does not then occur in the context whether to support additional taxes for the *bonded* project—it is too late for that because the project has already been initiated or even com-

pleted—but rather it occurs in the context whether to support additional taxes for *existing* and often crucial public services, such as police or fire protection. There is no longer any direct vote as envisioned by the Headlee Amendment concerning the spending commitment that actually precipitated the potential tax increase.

The effect of the LTGO bond is to impose an inexorable pressure upon the people to accommodate local public spending as if the Michigan Constitution had never been amended by the Headlee Amendment. Rather than basing levels of expenditures upon available revenues, as intended by the Headlee Amendment, the LTGO bond effectively bases levels of revenues upon actual expenditures. By vitiating the requirement that the people cast a direct vote *preceding* the spending commitment, an important element of the Headlee Amendment has been eroded.[2]

In enacting the Headlee Amendment, "we the people" expressed the view that their personal freedoms were implicated by high levels of public spending and taxation in the same manner as by abridgments of free speech and unreasonable searches and seizures. In interpreting and in enforcing the provision of the Headlee Amendment, the executive and judicial branches of government should recognize that it is

---

[2] I also do not join in the majority's discussion of *Bigger v Pontiac*, 390 Mich 1, 4-5; 210 NW2d 1 (1973). That discussion would be more compelling, in my judgment, if it had set forth at what point plaintiffs *would* have been authorized to challenge the action of the board of commissioners under Const 1963, art 9, § 32. Had plaintiffs filed suit at any earlier juncture, it would doubtlessly have been argued that the suit was not yet justiciable or was premature. *Bigger*, which preceded the Headlee Amendment, cannot be understood to vitiate effectively an express provision of the constitution affording an individual the opportunity to sue for its violation. I concur with the substantive conclusions of the majority only.

entitled to respect commensurate with that owed
longer-standing provisions of the Michigan
Constitution.