*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RAMON JACKSON,

Plaintiff-Appellant,

and

MALIK SHELTON, JOSEPH GRIFFIN, IVAN
GOLLMAN, JAMARR BILLINGSLEA, SABRINA
GREEN, KENNY HOLLOWAY, TERRANCE
FLETCHER, JANEE BYRD, and THERON
BARKSDALE,

Plaintiffs,

v

MAYOR OF DETROIT, DETROIT CITY
COUNCIL MEMBERS, and DETROIT CHIEF
FINANCIAL OFFICER,

Defendants-Appellees.

UNPUBLISHED
September 29, 2022

No. 359881
Wayne Circuit Court
LC No. 21-000621-CZ

Before: CAVANAGH, P.J., and GARRETT and YATES, JJ.

PER CURIAM.

Plaintiff, Ramon Jackson, led a group of concerned Detroit residents in sounding the alarm about the city's issuance of bonds without proper notification and authorization. Specifically, the plaintiffs contended that Detroit issued bonds beyond the city's borrowing limit and kept residents uninformed about the city's bonding efforts. The trial court, on summary disposition, carefully considered the plaintiffs' arguments and concluded that all of the defendants (the Mayor of Detroit, the Detroit City Council Members, and Detroit Chief Financial Officer John Naglick (collectively Detroit)) were entitled to prevail because the bonds were issued before plaintiffs filed suit. Under the preclusive doctrine discussed in *Bigger v Pontiac*, 390 Mich 1; 210 NW2d 1 (1973), and *Sessa v Macomb Co*, 220 Mich App 279; 559 NW2d 70 (1996), the issuance of bonds stops challenges in their tracks because no meaningful remedy can be provided without harming bond-holders. We

-1-

are bound to apply that preclusive doctrine to end this lawsuit, and we also conclude that Detroit did not issue bonds in excess of the debt limit imposed by MCL 117.4a(2). Thus, we affirm.

## I. FACTUAL BACKGROUND

In August 2020, plaintiffs, a group of Detroit residents appearing *in propria persona*, filed a complaint seeking declaratory and injunctive relief under MCR 2.605. The complaint alleged that Detroit issued unlimited tax general obligation bonds without the proper voter authorization required by MCL 141.164. Plaintiffs asked the trial court to enter a declaratory judgment revoking the "illegally issued bonds."

Detroit answered plaintiffs' complaint and attached election ballots from 2004 and 2009 authorizing the issuance of unlimited tax general obligation bonds. Detroit included a table that showed voter authorization of the city's bonds and the remaining amounts still unissued as of June 2019. Detroit then moved for summary disposition pursuant to MCR 2.116(C)(10), asserting that because the bonds had already been issued, plaintiffs' claim was barred under *Bigger* and *Sessa*. Detroit argued that even if plaintiffs' claim was not barred, it had submitted evidence that voters had authorized the issuance of the bonds. In support of its argument, Detroit attached an affidavit from Naglick. In his affidavit, Naglick attested that Detroit's net debt was currently under the debt limit established by MCL 117.4a(2). Along with his affidavit, Naglick attached pages from the appendix of Detroit's "offering circular for the Proposal N bonds . . . ." This showed Detroit's net indebtedness and debt limitations as of December 31, 2020. It showed that, as of December 31, 2020, Detroit's total debt limit was $2,081,898,768 and Detroit had $735,864,104 outstanding for unlimited tax general obligation bonds and limited tax general obligation bonds.

Instead of a response, plaintiffs filed a cross-motion for summary disposition under MCR 2.116(C)(9), contending that Detroit had issued bonds in 2014, 2016, 2018, and 2020 in violation of the debt limit imposed by Article 7, § 11, of Michigan's 1963 Constitution and MCL 117.4a(2). But plaintiffs offered no evidence to support this assertion. Plaintiffs also argued that Detroit could not rely upon voter authorization from the 2004 and 2009 elections to justify issuing bonds after 2009. According to plaintiffs, this was because Detroit's population dropped after those elections and because Detroit had used some of the proceeds from the bond sales to fund projects that voters had not approved. Additionally, plaintiffs insisted that the preclusive doctrine from *Bigger* could not apply because in this case, unlike in *Bigger*, voters had never approved the challenged bonds. Detroit filed a response to the cross-motion by reiterating that the claim was barred and noting that Naglick's affidavit established authorization. Detroit contended that plaintiffs had furnished no admissible evidence to contest Naglick's affidavit.

The trial court granted Detroit's motion for summary disposition, concluding that plaintiffs' claim was barred by the preclusive doctrine discussed in *Bigger* and *Sessa*. The trial court declined to consider plaintiffs' claim that Detroit had issued bonds in excess of the statutory debt limit because plaintiffs had not pleaded that claim in their complaint. Jackson now appeals.

## II. LEGAL ANALYSIS

Jackson argues that the trial court erred by granting summary disposition to Detroit and ruling that plaintiffs' claim was barred. This Court reviews de novo the grant or denial of a motion for summary disposition. *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

In *Bigger*, the city of Pontiac issued bonds to cover part of the cost of acquiring a stadium. *Bigger*, 390 Mich at 3. A day after the bonds were sold, the plaintiffs sued, attacking the decision to defer construction of the stadium's dome and challenging terms of a lease agreement. *Id*. at 3-4. Our Supreme Court dismissed the plaintiffs' claim without considering the merits, reasoning that the lawsuit was untimely and would have prevented an orderly process of adjudication. *Id*. at 4-5; *Sessa*, 220 Mich App at 286.

In *Sessa*, the plaintiffs challenged a municipality's issuance of bonds after the bonds had been sold and issued to investors. *Sessa*, 220 Mich App at 287. This Court held that the preclusive doctrine from *Bigger* barred consideration of the merits of the claim. *Id*. at 286-287. This Court emphasized that, because the plaintiffs had waited to sue until after the bonds had issued, the interests of the third-party investors were at stake:

> An equally important aspect of the *Bigger* rule comes into play here where suit was not begun until *after* the bonds had been issued and sold on the open market. The interests of third parties, the bondholders, who are bona fide purchasers for value and who, at the time of purchase, were not on notice of any such challenge, represents a vested interest that the entertaining of such litigation on its merits could defeat. In this regard, therefore, the *Bigger* rule is distinct from the statute of limitations and simply obligates those who would challenge such action to move promptly. [*Id*. at 287 (citation omitted).]

Here, like in *Sessa*, plaintiffs did not raise their challenge until the bonds were sold and issued. In their complaint, plaintiffs challenged bonds issued by Detroit in 2014, 2016, 2018, and 2019, yet did not sue until August 21, 2020.[1] By that time, the challenged bonds were already in the hands of third-party investors, and Detroit had used the proceeds from the bond sales to make public improvements. Under the preclusive doctrine discussed in *Bigger* and *Sessa*, plaintiffs did not timely employ the judicial process, so the trial court correctly deemed their claim precluded.

Jackson argues that this Court should not apply *Bigger* and *Sessa* because voters never authorized the bonds at issue and because Detroit never provided notice of its intent to issue bonds. Plaintiffs have not offered any evidence suggesting that Detroit failed to obtain voter authorization to issue the bonds or that Detroit failed to provide notice of its intent to issue the bonds and of the electorate's right to a referendum. As the party that would carry the ultimate burden at trial, it was plaintiffs' burden to produce evidence to support their claim, not Detroit's obligation to produce evidence to refute it. *Law Offices of Jeffrey Sherbow, PC v Fieger & Fieger, PC*, 507 Mich 272, 304; 968 NW2d 367 (2021) (plaintiffs bear the ultimate burden of establishing elements of their

---

[1] Plaintiffs challenge the "2020 Prop N bond," which was supposedly issued in February 2021. But plaintiffs did not identify this bond in their complaint, nor is there any evidence showing that such bond existed. We note that, in his affidavit, Naglick alluded to this Proposition N bond, but Naglick provided no information about it other than that it was issued at some point in 2021.

legal cause of action); *Quinto v Cross & Peters Co*, 451 Mich 358, 361-362; 547 NW2d 314 (1996) (noting that party that will not bear the burden of proof at trial may move for summary disposition on grounds that opposing party has not produced evidence in support of its claim). Furthermore, Detroit came forward with evidence that it sought voter authorization to issue unlimited tax general obligation bonds during the November 2, 2004, election and in the February 24, 2009, election. Detroit also furnished a table showing that voters had authorized the issuance of $399,000,000 in unlimited tax general obligation bonds.[2] Also, Naglick attested that all outstanding unlimited tax general obligation bonds issued by the city received voter authorization before the bonds were issued.

Jackson contends that, even if Detroit sought and obtained voter authorization in the 2004 and 2009 elections, this voter authorization was not necessarily valid after 2009. In presenting this argument, Jackson directs our attention to *Quaid v Detroit*, 319 Mich 268; 29 NW2d 687 (1947). In *Quaid*, our Supreme Court considered whether a lapse of time following voter approval impliedly revoked authority to continue to issue bonds. *Id*. at 270-271. Reviewing authority from other jurisdictions considering this question, our Supreme Court explained that "a mere lapse of time" did not invalidate voter approval, but a lapse of time in combination with other circumstances could indicate voter approval had been revoked. *Id*. at 273. Our Supreme Court identified several circumstances relevant to deciding whether voter approval had lapsed, including whether the proceeds from the bond sale would be used to finance the same project voters had previously authorized, whether there had been a change in the physical makeup of the community since authorization, and the city's reason for delaying issuance. *Id*. Although our Supreme Court did not hold so explicitly, it indicated that courts should give deference to a city's decision to delay issuance. *Id*. Applying this to the facts before it, our Supreme Court found the city's delay of 19 years had not impliedly revoked the electorate's approval:

> In the case at bar, it is conceded that the city was prevented from issuing the bonds here in question from 1932 until 1945 by conditions beyond its control, that the authority to issue said bonds had not been revoked, that the territorial and corporate limits of the city were the same as in 1928, that it had been considered by the city authorities that the issue was prevented by overall debt limitations imposed by statute and city charter, that the purpose of the present bond sale was the same as originally authorized, that the proceeds were to be used as originally proposed, and that there was no abuse of discretion or fraud shown. Under these conditions, we conclude that the delay in issuance of the bonds does not invalidate the approval by the electors. [*Id*. at 275.]

Jackson suggests that, in this case, voters' authorization from 2004 and 2009 was no longer valid by 2014 because, after the 2009 election, Detroit declared bankruptcy and there was a decline in Detroit's population. Assuming, *arguendo*, that record evidence supports Jackson's assertions

---

[2] We note the table shows that, as of June 30, 2019, $148,078,286 worth of unlimited tax general obligation bonds remained unissued. Though these bonds remained unissued, plaintiffs did not seek to prevent Detroit from issuing these bonds in their complaint, which challenged only bonds already sold and issued.

about Detroit's bankruptcy and the decline in its population, this alone would not show that voter authorizations from 2004 and 2009 were impliedly revoked. *Quaid* emphasized the importance of considering a city's reason for delaying issuance and giving deference to that stated reason. See *id*. at 273. In the absence of evidence of Detroit's reasoning for delaying issuance, we cannot conclude that Detroit abused its discretion or committed fraud in delaying issuance of the bonds. Thus, Jackson has failed to show that the voter authorizations from the 2004 and 2009 elections were no longer valid after the 2009 election.

Jackson next argues that the trial court erred by declining to consider plaintiffs' claim that Detroit was in excess of its debt limit pursuant to MCL 117.4a(2) when it issued bonds from 2014 through 2020. In their complaint, although plaintiffs cited MCL 117.4a(2), they did not allege that Detroit had issued the bonds in excess of its debt limit. Because plaintiffs did not explicitly allege that Detroit issued bonds in excess of its debt limit, the trial court declined to entertain this issue. Jackson argues this was error.

Regardless of whether the trial court should have considered plaintiffs' claim, the trial court reached the right result. Plaintiffs' contention that Detroit issued bonds in excess of its debt limit was a part of their claim that the bonds were invalid. And as already discussed, *Bigger* and *Sessa* preclude considering the merits of a challenge to municipal bonds already sold and issued. *Bigger*, 390 Mich at 3-5; *Sessa*, 220 Mich App at 286-287. But even if plaintiffs' claim were not barred by *Bigger* and *Sessa*, plaintiffs failed to offer any evidence showing that Detroit was in excess of its debt limit when it issued bonds from 2014 through 2020.

As MCL 117.4a(2)(a) states: "Notwithstanding a charter provision to the contrary, the net indebtedness incurred for all public purposes must not exceed . . . [t]en percent of the assessed value of all the real and personal property in the city." Under MCL 117.4a(9), when computing a municipality's debt limit under MCL 117.4a(2)(a), an "assessed value equivalent" may be added to the assessed value of the real and personal property in the municipality. This assessed value equivalent is calculated by dividing the sum of certain city revenues by the city's millage rate for the fiscal year. MCL 117.4a(9). In full, MCL 117.4a(9) provides as follows:

> In computing the net indebtedness for the purposes of subsection (2), there may be added to the assessed value of real and personal property in a city for a fiscal year an amount equal to the assessed value equivalent of certain city revenues as determined under this subsection. The assessed value equivalent must be calculated by dividing the sum of the following amounts by the city's millage rate for the fiscal year:

> (a) The amount paid or the estimated amount required to be paid by the state to the city during the city's fiscal year for the city's use under the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.901 to 141.921, and the amount of any eligible reimbursement to the city under the local community stabilization authority act, 2014 PA 86, MCL 123.1341 to 123.1362, except any amount distributed under section 17(4)(c) of the local community stabilization authority act, 2014 PA 86, MCL 123.1357, in excess of the city's qualified loss. The department of treasury shall certify these amounts upon request. As used in

this subdivision, "qualified loss" means that term as defined in section 5 of the local community stabilization authority act, 2014 PA 86, MCL 123.1345.

> (b) The amount levied by the city for its own use during the city's fiscal year from the specific tax levied under 1974 PA 198, MCL 207.551 to 207.572.

> (c) The amount levied by the city for its own use during the city's fiscal year from the specific tax levied under the commercial redevelopment act, 1978 PA 255, MCL 207.651 to 207.668. [MCL 117.4a(9)(a), (b), and (c).]

At least for the years 2014 through 2019, plaintiffs provided no evidence that identified the sum of the revenues listed in MCL 117.4a(9) or the applicable millage rates. Without these figures, Detroit's assessed value equivalent under MCL 117.4a(9) cannot be calculated for 2014 through 2019, and so Detroit's debt limit for those years cannot be determined. Hence, plaintiffs failed to provide any evidence supporting their argument that Detroit was over its debt limit when it issued bonds from 2014 through 2019.

To the extent that Jackson argues that Detroit was over its debt limit when it issued bonds in 2020 or 2021, Jackson identifies no evidence that Detroit issued any bonds after 2019. Naglick's affidavit alluded to bonds being sold in 2021, but Naglick's affidavit shows that Detroit was under its debt limit at the end of 2020. Specifically, Naglick's affidavit reveals that, as of December 31, 2020, Detroit had an assessed value (represented as the state equivalent value) of $10,634,752,689, and an assessed value equivalent of $10,184,234,991. The sum of these figures multiplied by 10% yielded a debt limit of $2,081,898,768. And according to Naglick's affidavit, Detroit had a total of $735,864,104 in outstanding debt for unlimited tax general obligation bonds and limited tax general obligation bonds.

Jackson contends that Naglick miscalculated the assessed value equivalent, and thereby inflated Detroit's debt limit. In his brief on appeal, Jackson asserts that the sum of the revenues specified in MCL 117.4a(9) for Detroit at the end of 2020 was $302,000,000, and he claims that the millage rate for Detroit in 2020 was 69.6 mills. Even if these numbers were correct, they would not show Detroit was over its debt limit for fiscal year 2020. If they were correct, it would show Detroit had an assessed value equivalent of $4,339,080,459.77, the result of $302,000,000 divided by the alleged millage rate of 69.6 mills (i.e., 302,000,000 divided by 0.0696). This assessed value equivalent plus the assessed value of $10,634,752,689 (a figure Jackson does not contest) totals to $14,973,833,148.77. Under that figure, Detroit would have a debt limit of $1,497,383,314.88. So, with a total of $735,864,104 outstanding in unlimited tax general obligation bonds and limited tax general obligation bonds at the end of fiscal year 2020, Detroit would still have been under its debt limit.[3]

---

[3] In his reply brief, Jackson claims that the sum of the revenues specified in MCL 117.4a(9) was $239,000,000 and that the millage rate for Detroit was 19.9520 mills. Using these figures, the assessed value equivalent would be $11,978,748,997.59. Adding the assessed value of $10,634,752,689 to that figure and multiplying by 10% yields a debt limit of $1,197,874,899.76. In other words, even using these figures, Detroit would still be under its debt limit.

-6-

Jackson also contests Naglick's averment that, by the end of 2020, Detroit had a total of $735,864,104 outstanding debt for unlimited tax general obligation bonds and limited tax general obligation bonds. In support of this, Jackson cites a document that states Detroit's "total bonded debt at June 30, 2020 was $2.10 billion . . . ." Even if this document were accurate, it would not undermine Naglick's affidavit. Under MCL 117.4a, not all bonded debt counts toward the debt limit of a municipality. The cited documentation does not reveal what portion of the $2.1 billion constituted bonded debt that was excludable under MCL 117.4a(4). Thus, this figure does not refute the assertion in Naglick's affidavit that Detroit had $735,864,104 outstanding for unlimited tax general obligation bonds and limited tax general obligation bonds.

We appreciate the plaintiffs' concerns and their laudable efforts to obtain redress through our courts, but we conclude that the trial court correctly granted summary disposition to Detroit.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kristina Robinson Garrett
/s/ Christopher P. Yates