STOLIKER *v.* BOARD OF STATE CANVASSERS.

1. CONSTITUTIONAL LAW—SUPREME COURT—JURISDICTION.

   It is the duty of the Supreme Court to uphold the Constitution adopted by the people as it does not have the jurisdiction either to draft or to change the Constitution.

2. SAME—CALL FOR CONVENTION—MAJORITY.

   A provision of the Constitution requiring for passage of a proposition a majority of those voting at an election cannot be carried merely by a majority of those voting on the proposition, where such majority is less than a majority of those voting at the election.

3. SAME—CALL FOR CONVENTION—MAJORITY.

   A call for a constitutional convention cannot be carried by the indifference of the electorate where the Constitution requires participation by a provision that the call will not be effective unless made by a majority of the electors voting at the election itself rather than merely a majority of those voting on the proposition to call a convention (Const 1908, art 17, § 4).

4. SAME—MAJORITY—ELECTION—CONVENTION.

   The term "such election" in the clause of the Constitution providing that "in case a majority of such electors voting at such election shall decide in favor of" a constitutional convention is, even when considered in the light of contemporaneous legal history, construed as meaning a majority of the electors who participated in the election generally, not merely those voting at the election on the proposition of calling a convention (Const 1908, art 17, § 4).

REFERENCES FOR POINTS IN HEADNOTES

[1, 8, 9] 11 Am Jur, Constitutional Law § 33.
[2-6] 11 Am Jur, Constitutional Law § 31.
[7] 14 Am Jur, Courts § 129.
[10] 35 Am Jur, Mandamus § 393.

5. SAME—AMENDMENT—CONVENTION—MAJORITY.

The framers of the Constitution clearly distinguished between the votes required for adoption of a simple amendment by the provision "if a majority of electors * * * voting thereon" and those required for calling a constitutional convention "in case a majority of such electors voting at such election shall decide in favor of a convention" (Const 1908, art 17, §§ 1, 4).

6. ELECTIONS — SUPREME COURT — CONSTITUTIONAL CONVENTION — BOARD OF STATE CANVASSERS.

The Supreme Court cannot compel the board of State canvassers to certify that the proposition to call a constitutional convention carried, where, although a majority of those voting on the proposition favored it, there was less than a majority of the entire number of electors who voted at the election favoring it (Const 1908, art 17, §§ 1, 4).

7. COURTS—OVERRULED CASES.

An earlier case will not be considered as having been overruled by a later case, where the earlier one is distinguished on facts and application of principle of law.

8. CONSTITUTIONAL LAW—CONVENTION—SUPREME COURT.

The argument that the people adopted measures in the Constitution a half century ago that are unduly restrictive of constitutional change does not convert the Supreme Court into a constitutional convention (Const 1908, art 17, § 4).

9. SAME—AMENDMENT.

Words in the Constitution may only be expunged or altered by the people, not by the Supreme Court.

10. COSTS—PUBLIC QUESTION—CONSTITUTIONAL CONVENTION.

No costs are allowed in mandamus proceeding against the board of State canvassers to compel it to certify that majority of those voting on proposition of whether a constitutional convention should be called when such majority was less than a majority of those voting at the biennial fall election at which the proposition was submitted pursuant to provision of the Constitution, a public question being involved (Const 1908, art 17, § 4).

Original petition for mandamus by Carl P. Stoliker against Esther Waite, Paul T. Schneider, Zoe E. Burkholz, and David Lebenbom, comprising the Board of State Canvassers, to compel them to certify that the question of calling a constitutional

convention, submitted at the November 4, 1958, election pursuant to the Constitution of 1908, art 17, § 4, did carry, and against James M. Hare, Secretary of State, to compel him to notify county clerks of the election of constitutional convention delegates. Submitted January 5, 1960. (Calendar No. 48,425.) Writ denied February 25, 1960.

*Peter E. Bradt,* for plaintiff.

*Paul L. Adams,* Attorney General, and *Samuel J. Torina,* Solicitor General, for defendants.

SMITH, J. The question before us is this: Does the Constitution require a different vote for the call of a constitutional convention than it requires for the adoption of an amendment to the Constitution?

The question before us is not the wisdom of providing for a different vote. That is a question for the draftsmen of the Constitution. Our duty is not to draft a Constitution but to uphold the one adopted by the people.

Nor is the question before us whether the Constitution should be changed because it is allegedly an outmoded, horse-and-buggy contraption better suited to the needs of 50 years ago, when it was adopted, than those of today. If it should be changed, it must be changed by the sovereign power that created it, the people. This Court does not have the jurisdiction to change the Constitution.

Having disposed of what this case is not, we return to what it is: Does the Constitution in fact require a different measure of the vote to call a constitutional convention from that required to adopt an amendment to the Constitution?

What the Constitution actually says is that the adoption of a constitutional amendment requires a

majority of the electors "voting thereon,"[1] whereas a call for a constitutional convention requires "a majority of such electors voting at such election."[2]

Thus the Constitution prescribes 2 measures of voter approval, depending upon the magnitude of the constitutional change under contemplation. These requirements seem simple and straightforward enough. We held in *People* v. *Board of State Canvassers,* 323 Mich 523 (sometimes referred to as the *Alger Case*), that they meant what they sa.d. Mr. Justice BUTZEL, writing for a unanimous court, held that where a Constitution requires, for the passage of a proposition, a majority of those voting at an election, the proposition cannot be carried merely by a majority of those voting on the particular proposition. It requires, rather, a majority of the votes cast at the election.

This decision is now assailed as having been erroneous. The assertions put before us by plaintiff all reduce to 1 fundamental proposition: that there is no difference in the vote required for the 2 actions, *i.e.,* either may be carried by a simple majority of those voting on the issue. The short answer is that the Constitution expressly provides to the contrary.

Before proceeding to re-examination of the words employed, and their meaning, it would be helpful to our understanding if we were to examine their origins, to ascertain, if possible, the reasons behind their inclusion. The words of a Constitution normally carry the gloss of history. They come to us not as the apt alliterations of the moment of draftsmanship but as the verbal symbols of political turmoil. So it is with the constitutional clauses before us. They do, indeed, mean far different things. The reasons for their differences are plain to all who stop

---

[1] Const 1908, art 17, §§ 1, 2.
[2] Const 1908, art 17, § 4.

to read for they lie deep in the roots of our political life.

It was the conviction of our forbears that our people should be safeguarded by a written Constitution, a device unknown to our English ancestors. It was intended by them to be a sacred and invulnerable document. It had been purchased at a staggering cost. It was not easily to be abandoned, in favor of new and more enticing structures of government, by mere temporary majorities. The allurements of the unknown and the untried are not unknown to government itself, as our founding fathers had good reason to know in this new world. The problem involved in the constitutional change, as clearly seen since our earliest days, and as expressed in The Federalist,[3] is the contest between "that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults." In short, it has been feared that easy change might degrade our constitutional principles to the level of statutes, some of which are hastily drawn and reflect excessive and partisan zeal. The threat of such action directed against our basic liberties has not been regarded as insubstantial. Daniel Webster denied the necessity for a revision of the whole Constitution once a government had been framed and spoke against providing for such an event.[4] James Madison suggested the concurrence of 2 of the 3 departments of State.[5] Rohlfing points out that only a minority of the original 13 States made provisions for changes in the basic law and that Delaware and South Carolina, the first States to authorize specific

[3] See The Works of Alexander Hamilton, edited by Henry Cabot Lodge, vol 9, p 274. (2d ed, vol 11, p 364. Federalist Paper No 43, part 8.—REPORTER.)

[4] Speaking in the Massachusetts Convention of 1820 and 1821, Journal of Debates and Proceedings in the Convention of Delegates, p 413.

[5] The Writings of James Madison (Hunt ed), pp 175, 176.

amendment, as well as general revision, were not followed by other States until 1835.[6] Whatever the particular safeguards employed in the various State constitutions, the procedures looking towards general constitutional revision were both dilatory and cumbersome as compared with the more expeditious procedures set up for less momentous changes. It has been the practice of the people of this country (and Michigan is no exception) to hedge about with numerous safeguards, sometimes called obstructions, the power to call conventions empowered to revise the organic law of the State. The problem presented is one of the balancing of interests. (This, we stress, was the problem facing the framers of our Constitution in 1908, not the courts of the State.) At the one extreme of voter participation, the calling of a constitutional convention empowered to rewrite the basic charter of government by the same simple procedures or majorities as are required for usual voter approval has been rejected much more often than accepted. At the other extreme, there has been no adoption of a requirement that such vote be unanimous. What has emerged from the debates between constitutional draftsmen in State after State has been a compromise as to safeguards, the form of which is a matter for determination by the people of the State, and not by the courts. It has varied from State to State. In some States, a 2/3 (not a mere majority) vote of the members of each house of the legislature is required to submit the question of calling a convention.[7] In Kentucky, action not at

---

[6] Rohlfing, Amendment and Revision of State Constitutions, 181 Annals of the American Academy of Political and Social Science, p 180.

[7] Calif Const (1879), art 18, § 2; Colo Const (1876), art 19, § 1; Del Const (1897), art 16, § 2; Fla Const (1885), art 17, § 2; Idaho Const (1890), art 20, § 3; Ill Const (1870), art 14, § 1; Kan Const (1859), art 14, § 2; Minn Const (1857), art 14, § 2; Mont Const (1889), art 19, § 8; Nev Const (1864), art 16, § 2; NM Const (1911), art 19, § 2; NC Const (1868), art 13, § 1; Ohio Const (1851), art

1 session of the general assembly but at 2 is necessary, and, moreover, the majority voting on the question must equal 1/4 of the number of electors voting in the last preceding general election.[8]   In still other States, the majority must be a majority of those voting at the election at which the question is submitted.[9]   Michigan is among the latter.   There is nothing ambiguous, confused, or contradictory here.   A call for a convention cannot be carried by the indifference of the electorate: the Constitution itself demands participation.

The Constitution also requires that a proposed constitution adopted by a constitutional convention be approved by a majority of the electors voting thereon.[0]   The measure of such approval, we observe, again, is a matter of weighing opposing considerations, some States specifically require a majority of the electors voting on the proposal.[1]   Others require a majority of those voting at the election.[2]   Still others require different measures of approval.[3]

16, § 2; SC Const (1895), art 16, § 3; SD Const (1889), art 23, § 2; Utah Const (1895), art 23, § 2; Wash Const (1889), art 23, § 2; Wyo Const (1889), art 20, § 3.   The Nebraska constitution requires a vote of 3/5 of the members elected to the legislature.   Neb Const (1875), art 16, § 2.

[8] Ky Const (1891), § 258.

[9] Ala Const (1901), art 18, § 286; Idaho Const (1890), art 20, § 3; Ill Const (1870), art 14, § 1; Kan Const (1859), art 14, § 2; Md Const (1867), art 14, § 2; Mich Const (1908), art 17, § 4; Minn Const (1857), art 14, § 2; Nev Const (1864), art 16, § 2; SC Const (1895), art 16, § 3; SD Const (1889), art 23, § 2; Utah Const (1895), art 23, § 2; Wash Const (1889), art 23, § 2; Wyo Const (1889), art 20, § 3.

[0] Mich Const (1908), art 17, § 4.

[1] Alaska Const (1956), art 13, § 1; Ariz Const (1910), art 21, § 2; Ga Const (1945), art 13, § 1; Md Const (1867), art 14, § 2; Mich Const (1908), art 17, § 4; Neb Const (1875), art 16, § 2; NY Const (1938), art 19, § 2; Ohio Const (1851), art 16, § 3; Okla Const (1907), art 24, § 2.

[2] Colo Const (1876), art 19, § 1; Ill Const (1870), art 14, § 1; Mont Const (1889), art 19, § 8; Utah Const (1895), art 23, § 3.

[3] The Hawaii constitution provides for ratification at a general election by a majority of all the votes tallied upon the question, such majority constituting at least 35% of the total vote cast at such election, or at a special election by a majority constituting at least

It is not unknown, in fact, that a constitution be not submitted to the people for approval, once having been drafted by a convention duly called.[4]

In opposition to the clear mandate of the Constitution certain arguments are urged upon us. We will address ourselves only to the legal arguments made, and will examine the questions submitted to us by plaintiff in his brief in the order put:

1. What election is referred to by the words "such election" in article 17, § 4, of the Constitution (1908)?

2. Should *People* v. *Board of State Canvassers,* 323 Mich 523, be followed?

As to the first question it is said that "contemporary and practical construction of the words 'such election' from the very first revision vote in 1849 through the 1906 revision election (which resulted in our present Constitution) was that they referred to the election on the revision question and not to an election on some other matter held on the same date."

We will accept, for purposes of argument, but without conceding, that a problem of interpretation is presented despite the clear differentiation made in the words of the Constitution itself respecting the votes required in the 2 situations. What, then, can fairly be said to have been the understanding of the people with respect to the issue here under consideration at the time of the adoption of the Constitution? Was it in truth, and despite what has been said, that there should be no difference between the vote required to call a constitutional convention and that for the adoption of an amendment merely?

A study of the contemporaneous legal history leaves no doubt as to the answer. The people in-

35% of the total number of registered voters. Hawaii Const (1950), art 15, § 2.

[4] *E.g.,* 18 Political Science Quarterly 480, 509, with particular reference to the Virginia Constitution of 1902.

tended to say just what they said in their Constitution, namely, that the vote required to call a constitutional convention must be a majority of those voting at the election. There had, as plaintiff points out, been some confusion on the subject in the early history of the State. But we are not seeking the understanding of the people in 1849, or in 1867, but that contemporaneous with the adoption of the Constitution of 1908. As to such there can be no serious question. The issue was clearly defined in 1899. In that year the attorney general ruled, in answer to a resolution of the house of representatives calling for his opinion (with respect to the general election held in November, 1898) upon this question:

"Do these words [majority of the electors * * * voting at such election] mean a majority of the electors voting upon the single proposition of constitutional revision, or a majority of the electors who participated in the election generally?"

His opinion, after examination of the authorities, was that the majority required was a majority of those participating as voters in the general election, not merely a majority of those voting on the issue (OAG 1899, pp 75, 76). Despite an effort on the part of certain legislators to nullify this opinion (see 1899 House Journal, pp 2199, 2679) it remained controlling on the question. Consequently the board of State canvassers later ruled, with respect to votes cast at the general election held in November, 1904, that the proposal to call a constitutional convention had failed to carry, despite the fact that a majority of those voting on the issue were in favor thereof, since those favoring the proposition did not constitute a majority of the voters participating in the election. See Michigan Manual, 1907, p 46. Less than a year later the legislature, obviously

acting under that portion of article 20, § 2, of the Constitution of 1850, authorizing an election upon the question of a general revision to be held "also at such other times as the legislature may by law provide," passed PA 1905, No 325, providing for a "special election to be held" for voting upon "the question of calling and holding a convention for the purpose of making a general revision of the Constitution." At this election a majority of qualified electors voting at such election having declared in favor of calling such convention, it was ruled that the proposition had been duly carried. The convention held in 1907–1908, resulting in the adoption of our current Constitution, was the direct outcome of these proceedings. It was this constitutional convention, so convened, that placed in our present Constitution the words here under study, differentiating between the vote required for a constitutional amendment and that required to call a constitutional convention. To construe the words "such election" to mean merely any submission of the issue to the people at any election, held at any time, for any purpose or purposes, where the mere fact that a constitutional convention is contemplated may be lost in a mass of parochial issues and a plethora of all grades of office seekers, is simply to destroy the safeguards (whether wise or foolish) that the people have placed in their basic charter. In shortest terms, it destroys, and without reason, the difference written into the Constitution between the vote on an issue and the vote at the election.

In short, we are now asked to hold that the people did not clearly understand what they were thus doing. We are asked to hold that, despite the 1899 opinion of the attorney general upon the very issue here presented, despite the unsuccessful legislative attempt to overcome it immediately thereafter, despite the ruling of the board of State canvassers that

the 1904 proposition had failed to carry for lack of the necessary majority, and despite the re-enactment in the new Constitution of the very language over which all of this turmoil had raged, the people did not really understand the clear meaning of the words they were using, once again, in their new Constitution. (Constitution 1850, art 20, § 2: "in case a majority of the electors, so qualified, voting at such election, shall decide in favor of a convention." Constitution of 1908, article 17, § 4: "In case a majority of such electors voting at such election shall decide in favor of a convention.") We are to hold that when they required to pass a constitutional amendment a majority of the votes cast thereon, and when they required to call a constitutional convention a majority of the votes cast at such election, they were actually prescribing no difference between the 2 votes but were in fact merely calling for the same vote on each. All of this we decline to do. The understanding of our people is not so meager. Their distinguished leaders who framed the Constitution were not so inept, so thoughtless, so blind to the issues of the day. From the language used it is clear that they meant to distinguish between the votes required for a simple amendment and those required to call a constitutional convention, and our holding is that they did so distinguish.

We have thus relied upon the contemporaneous understanding of the people. Their understanding is as relevant today as it was a half-century ago and it has a direct applicability to the situation before us. When the people went to the polls in 1958 to vote upon the question of a constitutional convention, they went with the contemporaneous understanding that a failure to vote upon the constitutional question would have the practical effect of a vote in the negative thereon. Such is not only the clear phrasing of the Constitution but the high-

est Court in the State had unanimously so ruled with respect thereto. We have no way of knowing how many of the 900,000 electors who failed to vote on the issue would have voted in the affirmative thereon, had they voted, or how many who failed to vote did so because of reliance upon the practical effect of their failure to vote. Obviously we cannot say that the proposition carried nor can we command the board of State canvassers, as plaintiff wishes, "to certify that the revision question carried."

The second argument urged upon us is that the case of *People* v. *Board of State Canvassers,* 323 Mich 523, "should be overruled because based upon an error of law." In support of this argument the plaintiff's brief asserts that such case was in error when it held that *Stebbins* v. *Judge of Superior Court of Grand Rapids,* 108 Mich 693, had not been overruled by *Shearer* v. *Board of Supervisors of Bay County,* 128 Mich 552. We do not agree. The cases are not inconsistent. This Court pointed out in the *Shearer Case, supra,* the distinction between the 2 cases in words so clear as to obviate the need for elaboration by us.

Many conceive the constitutional requirement hereinabove discussed to be an impediment to the economic and social well-being of this State. We are urged, as though we were a constitutional convention faced with a choice of alternatives, to choose that one the more beneficial to our people. All of this misconceives the problem presented to this Court. We are not a constitutional convention. We have before us for consideration a Constitution already adopted, the words of which are clear and clearly stated. We have no choice of alternatives presented to us. The people themselves made the choice, now urged upon us, back in 1908. The argument that their choice is, a half-century later, shown to have been unduly restrictive of constitu-

tional change does not constitute this Court into a constitutional convention, empowered somehow at this date, to make a wiser choice.

The constitutional words before us, onerous though they made be, are the onerous words of the people themselves and by the people only may they be expunged. They are beyond our jurisdiction to alter or amend. The action of the Indiana court in *In re Todd,* 208 Ind 168 (193 NE 865), has been warmly commended to us. In this case the Indiana court changed the rule long prevailing in that State as to the counting of votes. We are urged to go and do likewise. Not cited to us, however, are the words of a later Indiana court, written many years after *Todd,* containing the melancholy admission that the opinion in the *Todd Case* "in substance amounted to a change in the constitution itself."[5] This course of judicial conduct, that of arrogating to ourselves the authority to change the Constitution itself, is a course upon which we will not embark. For if we may today interpret out of the Constitution this obstacle to rapid constitutional change, we may tomorrow interpret out still another obstacle to rapid popular action, the slow and cumbersome jury process, or the time-consuming secret ballot. The problem we face is not how a wise Constitution would have been phrased, but whether the particular Constitution before us will be held inviolate. We have been quick to strike down legislative tampering with its precepts. It is equally secure from judicial profanation, though its security is measured only by the tradition of the law, our sense of self-restraint.

The constitutional scheme is clear. The reasons for its adoption are manifest, whether wise or unwise. The words employed are "plain and free

---

[5] *Swank* v. *Tyndall,* 226 Ind 204, 221 (78 NE2d 535, 542).

from ambiguity."[6]   The arguments and authorities once more urged upon us[7] as aids to "interpretation" have gained nothing in validity or applicability since our prior determination of this matter, and those newly devised are unimpressive. The simple, inescapable fact is that the Constitution clearly distinguishes between the vote required to approve a constitutional amendment and that required to call a constitutional convention.

Writ denied. No costs, a public question.

DETHMERS, C. J., and CARR, KELLY, EDWARDS, and KAVANAGH, JJ., concurred.

BLACK, J., took no part in the decision of this case.

SOURIS, J., did not sit.

---

[6] *People* v. *Board of State Canvassers*, 323 Mich 523, 528.
[7] All parties hereto have referred to the briefs heretofore filed with this Court in *People* v. *Board of State Canvassers*, *supra*.