BOLT v CITY OF LANSING

Docket No. 192944. Submitted July 1, 1996, at Detroit. Decided January 13, 1997, at 9:00 A.M. Leave to appeal sought.

Alexander Bolt, a taxpayer by virtue of his ownership of real estate located in the City of Lansing, brought an original action in the Court of Appeals against the city, challenging the city's storm water service charges as being a disguised tax. The charges were imposed on property owners pursuant to an ordinance adopted by the Lansing City Council without submitting the question to the city's residents for a vote. The ordinance provides for the creation of a storm water enterprise fund to defray the costs to effectuate the complete separation of the city's storm water and sewage systems and provide for the treatment of the storm water to remove pollutants before the water is discharged into navigable waterways. The ordinance provides that the estimated $176 million cost over thirty years is to be financed through an annual storm water service charge imposed on each parcel of real property in accordance with a formula designed to roughly estimate the storm water runoff of each parcel. The ordinance provides for certain late payment fees for storm water charges paid after the due date and for the creation of a lien against the property affected in the event any charges remain unpaid for more than six months. The plaintiff alleged that the ordinance violates certain sections of the Headlee Amendment, Const 1963, art 9, §§ 25-34, because the charge imposed by the ordinance is a tax that requires voter approval. The city alleged that the charge is a user fee not subject to voter approval and that no violation of the Headlee Amendment occurred.

The Court of Appeals held:

1. The Court of Appeals has concurrent jurisdiction with the circuit court with regard to the legal issues presented in this case. The administrative issues are not cognizable under Const 1963, art 9, §§ 25-31 and therefore are not within the Court of Appeals original jurisdiction under Const 1963, art 9, § 32.

2. There is no bright-line test to distinguish a fee from a tax. However, a fee generally is exchanged for a service rendered or a benefit conferred, and there must be some reasonable relationship

between the amount of the fee and the value of the service or benefit. A charge against the property of a landowner based solely on the value of the land, such as an ad valorum property tax, is a tax.

3. Sewage disposal charges to landowners constitute a user fee, not a tax. Charges for storm water collection, detention, and treatment (which is properly subject to a fee and not a tax when combined with sewage disposal) do not lose their character as a fee by virtue of being separated from sewage collection and disposal. The result does not change by separating the systems—the charge here is a user fee, not a tax.

Judgment for the defendant of no cause of action.

MARKMAN, J., dissenting, stated that the charges mandated by the ordinance are a tax and therefore a vote of the people was required by the Headlee Amendment. Because there was no vote of the people, the charges are contrary to the constitution and are null and void.

A multiplicity of factors must be considered and weighed to determine whether the charge is a tax or a user fee.

A fee must be plainly intended as a police regulation, not as a means primarily of producing revenue, and the revenue must be proportionate to the cost of the regulatory activity. Here, there has been no effort to allocate to the general fund even that portion of the capital costs that will have a useful life in excess of thirty years. The charge is not structured to simply defray the costs of a regulatory activity, but rather to fund a public improvement designed to provide a long-term benefit to the city and all its citizens. The revenue to be derived from the charge is clearly in excess of the direct and indirect costs of actually using the storm water system over the next thirty years and, being disproportionate to the costs of the services provided and the benefits rendered, constitutes a tax. The capital investment component of a true fee may not be designed to amortize such an expense, and to enable the city to fully recoup its investment, in a period significantly shorter than the actual useful service life of the public improvement.

Because the charges are disproportionate to the incremental costs, enforcement of the charge through a lien on the property buttresses the contention that the charge is a tax in disguise.

The charges do not correspond to the benefits conferred because property owners already served by a fully bifurcated sewer system, approximately seventy to seventy-five percent of the property owners, many of whom have paid for such separation by special assessments, are charged the same amount as property owners who realize the full benefits of the new construction.

The element of volition characteristic of a true fee is not present in this case.

The beneficial treatment of charitable institutions by the ordinance, combined with the other circumstances presented, belies a legislative purpose to enact what truly is a tax.

1. WORDS AND PHRASES — FEE — TAX.

There is no bright-line test to distinguish a fee from a tax; a fee is exchanged for a service rendered or a benefit conferred, and there must be some reasonable relationship between the amount of the fee and the value of the service or benefit; a charge against the property of a landowner based on the value of the land, such as an ad valorum property tax, is a tax.

2. MUNICIPAL CORPORATIONS — TAXATION — USER FEES — SEWAGE DISPOSAL — STORM WATER COLLECTION.

Sewage disposal charges to landowners constitute a user fee, not a tax; charges for storm water collection, detention, and treatment (which is properly subject to a fee and not a tax when combined with sewage disposal) do not lose their character as a fee by virtue of being separated from sewage collection and disposal.

*Jeffrey Zoeller*, for Alexander Bolt.

*James D. Smiertka*, City Attorney, and *Jack C. Jordan*, Associate City Attorney, for the City of Lansing.

Amici Curiae:

*Honigman Miller Schwartz and Cohn* (by *William C. Whitbeck*), for Edward Rose Associates, Inc., Huron Development Limited Partnership, and Edward Rose Realty, Inc.

*R. Bruce Laidlaw*, for the Michigan Municipal League.

*Dykema Gossett PLLC* (by *Stewart L. Mandell* and *Zora E. Johnson*), for Lansing Regional Chamber of Commerce.

Before: SAAD, P.J., WAHLS and MARKMAN, JJ.

SAAD, P.J. In this original action under Const 1963, art 9, § 32, plaintiff, a taxpayer by virtue of his ownership of real estate located in the City of Lansing, challenges the city's storm water service charges as being a disguised tax. The question presented is whether Lansing may charge landowners for the cost of separating the storm water and sewage systems, and treating the storm water runoff, without submitting the question to the taxpayers for a vote. The answer is "yes" if the charge is a user fee; "no" if it is a tax.

I

FACTS

The existing Lansing wastewater disposal system combines sewage with storm water. During periods of heavy precipitation, the capacity of the city's sewage treatment is such that combined storm water and sewage flows untreated into the Grand and Red Cedar Rivers, two navigable waterways. However, the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act, 33 U.S.C. 1251 *et seq.*, requires the separation of storm water from sewage and that the storm water be treated to prevent pollution caused by surface water runoff.[1]

In its effort to comply with the Clean Water Act, in 1995, the City of Lansing adopted Ordinance No. 925, which added a new Chapter 1043 to the Ordinances of the City of Lansing, which provides for the creation of a storm water enterprise fund to defray the cost of improvements to the city's storm water disposal system. Ordinance 925 will effectuate complete

---

[1] This pollution may be caused by agricultural chemicals, fertilizers, pesticides, petrochemicals produced by motor vehicle emissions and washed from the roads into the storm water system, and other pollutants.

separation of the storm water and sewage systems, and provide for treatment of storm water to remove pollutants before the water is discharged into navigable waterways, at an estimated cost of $176,000,000 over the next thirty years. The ordinance was adopted by the Lansing City Council and was not submitted for approval to the electors of the city.

The ordinance establishes a storm water enterprise fund and provides that associated storm water treatment system costs will be financed through an annual storm water service charge. This charge is imposed on each parcel of real property in the city in accordance with a formula, developed with engineering consultation, designed to roughly estimate each parcel's storm water runoff.

Expected storm water runoff is calculated in terms of equivalent hydraulic area (EHA) units based upon the amount of pervious and impervious surface soils[2] within each parcel. Residential parcels with two acres or less of surface area are not individually measured but are charged according to certain flat rates set forth in the ordinance, based upon a predetermined number of EHA units per 1,000 square feet.

Ordinance 925 provides for a system of administrative appeals by property owners who contend that their properties are unfairly assessed. Under this process, a property owner may reduce or, theoretically, eliminate the storm water fee by showing that an individual property produces no storm water runoff, or that its actual runoff is less than the city's methodol-

---

[2] "Pervious" areas are undeveloped surfaces that absorb water, whereas "impervious" areas are developed nonvegetative surfaces that impede water absorption and thus exacerbate rather than reduce storm water runoff.

ogy suggests. Thus, a property owner can receive a fee reduction for creating a retention system, and a property owner whose property is topologically concave, with sufficient depth to exceed any anticipated level of precipitation, could, in theory, avoid the storm water charge, except for an availability charge.

The city began billing property owners under Ordinance 925 in December 1995, with a March 15, 1996, due date for the storm water charge. Plaintiff was billed $59.83 for his 5,400-square-foot parcel. Ordinance 925 provides for the addition of certain late payment fees for storm water charges paid after March 15 and for the creation of a lien against the property affected in the event any charges remain unpaid for more than six months.

On March 4, 1996, plaintiff filed his complaint claiming that Ordinance 925 violates Const 1963, art 9, §§ 25 and 31. After considering plaintiff's complaint and defendant's answer, this Court, pursuant to MCR 7.206(D)(3), ordered the matter to proceed in the same manner as an appeal of right or on leave granted and invited interested parties to file amicus curiae briefs. Amicus curiae briefs were filed by the Michigan Municipal League and the Lansing Regional Chamber of Commerce in support of the ordinance, and by Edward Rose Associates, Inc., Edward Rose Realty, Inc., and Huron Development, Limited Partnership, and Citizens to Abolish the Rain Tax Ordinance[3] in support of plaintiff's position.

---

[3] The amicus curiae brief filed by Citizens to Abolish the Rain Tax Ordinance is not in the form prescribed by MCR 7.212(C) and is signed by a person who does not identify himself as an attorney, who is not listed in

II

ANALYSIS

Although both parties raise jurisdictional and administrative issues, we note simply that with regard to the legal issues presented, this Court has concurrent jurisdiction with the circuit court, *Waterford School Dist v State Bd of Ed*, 98 Mich App 658; 296 NW2d 328 (1980), but that the administrative issues presented are not cognizable under Const 1963, art 9, §§ 25-31, and therefore, they are not within this Court's original jurisdiction under art 9, § 32. *Grosse Ile Committee for Legal Taxation v Grosse Ile Twp*, 129 Mich App 477, 486; 342 NW2d 582 (1983).

The sole issue here is whether the charge to landowners for the cost of separating the storm water and sewage systems and treating the storm water runoff is a "tax" or a "user fee." If it is a tax, it is unquestionably a tax increase as well as a tax that was not in effect on December 23, 1978, the effective date of the Headlee Amendment, Const 1963, art 9, §§ 25-34, and thus would be a tax that requires voter approval pursuant to Const 1963, art 9, § 31. In other words, Ordinance 925 would run afoul of the Headlee Amendment. If, however, the charge is a user fee, as the city contends, then it is simply unaffected by Article 9.

---

the State Bar of Michigan Directory as a licensed attorney, and who has supplied no State Bar number. Because this brief is filed on behalf of an organization and not on behalf of the individual signing the brief, preparation of the brief by one who is not a licensed attorney constitutes the unauthorized practice of law and is a contempt of this Court. MCL 600.916; MSA 27A.916; *Bay Co Bar Ass'n v Finance System, Inc*, 345 Mich 434; 76 NW2d 23 (1956). In lieu of issuing an order to this individual to show cause why he should not be held in contempt of this Court, this Court instead has decided to order that the brief be stricken.

The difficulty we face here is that the Headlee Amendment fails to define or redefine a tax or a fee, and historically, there is no bright-line test that distinguishes the two. In general, a fee is exchanged for a service rendered or a benefit conferred, and there must be some reasonable relationship between the amount of the fee and the value of the service or benefit. *Merrelli v St Clair Shores*, 355 Mich 575, 584-588; 96 NW2d 144 (1959); *Northgate Towers Associates v Royal Oak Charter Twp*, 214 Mich App 501, 503-504; 543 NW2d 351 (1995); *Foreman v Oakland Co Treasurer*, 57 Mich App 231, 237-238; 226 NW2d 67 (1974).

For example, if a landowner opts to sign up for a city snow removal service and is charged accordingly, this would clearly constitute a user fee.[4] Conversely, a charge against the property of a landowner based solely on the value of the land (such as an ad valorum property tax) represents the other end of the spectrum—a tax.[5] Sewage disposal and treatment, therefore, falls somewhere between these two ends of the spectrum.

Our Supreme Court has answered this question insofar as sewage treatment is concerned. Sewage

---

[4] See, generally, *Kirk v Denver Publishing Co*, 818 P2d 262, 271 (Colo, 1991):

> A user fee is in the nature of a special fee designed to defray the cost of a governmental service and is imposed on the users of that service. . . . A valid user fee need not be designed with mathematical precision to defray the cost of the service for which the fee is imposed, but must bear some reasonable relationship to the overall cost of that service.

[5] An ad valorem tax is defined as a tax levied on property or an article of commerce in proportion to its value as determined by assessment or appraisal. *Airlines Parking, Inc v Wayne Co*, 452 Mich 527, 535, n 12; 550 NW2d 490 (1996).

disposal charges to landowners constitute a user fee, not a tax. *Ripperger v Grand Rapids*, 338 Mich 682, 686 ff; 62 NW2d 585 (1954). In *Ripperger*, the Court looked to established law (that charges for furnishing water to city residents were a fee and not a tax), and concluded by analogy that charges for provision of sewage disposal similarly constituted a fee rather than a tax. From this analysis in *Ripperger*, we conclude that, here, charges for storm water collection, detention, and treatment (which even plaintiff concedes was properly subject to a fee and not a tax when combined with sewage disposal) do not lose their character as a fee by virtue of being separated from sewage collection and disposal. Therefore, for the reasons stated in *Ripperger*, we hold that the result does not change by separating the systems—the charge here is a user fee, not a tax.[6]

With regard to the argument that municipalities may abuse the "user fee" concept to avoid the Headlee Amendment, the answer lies in reviewing such challenged conduct case by case or in an additional constitutional amendment that addresses more clearly this precise issue. Unless a particular fee, however, violates the constitution, the judiciary has no role to play in resolving such political questions. Const 1963, art 3, § 2.

---

[6] The manner by which the city has chosen to enforce the fee does not establish that the fee is a tax merely because an unpaid fee results in a lien on property. Other Lansing ordinances provide that the city's municipally owned and operated electric and drinking water distribution systems, entrusted to the Lansing Board of Water & Light, has the benefit of a lien on property for unpaid utility charges. At common law, liens arise in many situations in which a charge or fee remains unpaid, and Michigan jurisprudence recognizes mechanics liens, artisans liens, and garage keepers liens, among others. See *Nickell v Lambrecht*, 29 Mich App 191; 185 NW2d 155 (1970).

The complaint being without merit, defendant is entitled to a judgment of no cause of action and to tax its costs. It is so ordered.

WAHLS, J., concurred.

MARKMAN, J. *(dissenting)*. I respectfully dissent. The people of the State of Michigan presumably enacted the Headlee Amendment, Const 1963, art 9, §§ 25-34, because they believed their liberties were as much threatened by governmental spending and taxing decisions as they were by governmental decisions concerning other subjects addressed in the Michigan Constitution, such as the regulation of speech, Const 1963, art 1, § 5, and the treatment of criminal suspects, Const 1963, art 1, § 20. Section 31 of the Headlee Amendment states in relevant part:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified . . . without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.[1]

Clearly, the people intended to alter the status quo by this provision. In interpreting a constitutional provision, the "primary rule" is to consider the "common understanding" of such a provision. *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). In addition, courts look to "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be

---

[1] See also Const 1963, art 9, § 25, which provides in relevant part that "[p]roperty taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval."

accomplished . . . ." *Id.* The Headlee Amendment "grew out of the spirit of 'tax revolt' and was designed to place specific limitations on state and local revenues. The ultimate purpose was to place public spending under direct popular control." *Waterford School Dist v State Bd of Ed*, 98 Mich App 658, 663; 296 NW2d 328 (1980); see also *Smith v Scio Twp*, 173 Mich App 381, 385; 433 NW2d 855 (1988).

As envisioned by its drafters, a critical aspect of the Headlee Amendment is its requirement that local governments directly obtain the assent of the people before embarking on a fiscal course of action that enhances the public sector at the expense of the private sector. Const 1963, art 9, §§ 25, 31; Headlee Blue Ribbon Commission Report to Governor John Engler, § 5, pp 22-23 (1994). However, it appears that some public officials view the Headlee Amendment as initiating a kind of parlor game by which they are challenged to devise increasingly creative means of circumventing constitutional constraints on public spending. See also *Sessa v Macomb Co*, 220 Mich App 279; 559 NW2d 70 (1996). It is not coincidental that the incidence of the imposition of various "fees"—as opposed to "taxes"—has soared in Michigan since enactment of the Headlee Amendment.[2] This Court's obligation to uphold the guarantees of the Headlee Amendment, and to protect against its erosion, is no less compelling than its obligation to uphold the mandates of longer-standing constitutional provisions.

The majority finds no constitutional impediment to Lansing's storm water utility charge established in Lansing Ordinance No. 925, which added a new Chap-

---

[2] See Headlee Blue Ribbon Commission Report, *supra*, § 5, pp 26-27.

ter 1043 to the Ordinances of the City of Lansing. It concludes that the storm water charge is a user fee, which is unaffected by the Headlee Amendment. However, in my judgment, Ordinance 925 is a "tax" with regard to which a vote of the people is required under the amendment. Const 1963, art 9, § 31. There having been no such vote, the charge is contrary to the Michigan Constitution and, therefore, is null and void.

The issue before us is whether the storm water utility charge is properly characterized as a fee or a tax. There is currently no bright line that distinguishes between a fee, which represents a permissible exercise of the police power, and a tax, which may be implemented only after compliance with the constitutional requirements of the Headlee Amendment. Rather, a multiplicity of factors necessarily must be considered and weighed.[3]

One established distinction in Michigan is that a fee must be plainly intended as a police regulation, "not as a means primarily of producing revenue," and that the revenue derived therefrom must be proportionate to the cost of the regulatory activity. *Vernor v Secretary of State*, 179 Mich 157, 167-170; 146 NW 338 (1914); *Bray v Dep't of State*, 418 Mich 149, 160-163; 341 NW2d 92 (1983). Here, the City of Lansing has proposed, through the storm water service charge, to fund $176 million in stormwater collection, detention, and treatment improvements over the next thirty years, a major portion of which (an estimated sixty-

---

[3] This case illustrates the wisdom of the Headlee Blue Ribbon Commission's recommendation that the state Legislature further define, by statute, the terms "tax," "fee," and "special assessment." See Headlee Blue Ribbon Commission Report, *supra*, Executive Summary and § 5, pp 29-31.

three percent) constitutes capital expenditures. How-
ever, no effort has been made to allocate even that
portion of the capital costs that will have a useful life
in excess of thirty years to the general fund. This is
an investment in infrastructure that will substantially
outlast the current "mortgage" that the storm water
charge requires property owners to amortize. At the
end of thirty years, property owners will have fully
paid for a tangible asset that will serve the city for
many years thereafter. Accordingly, the "fee" is not
structured to simply defray the costs of a "regulatory"
activity, but rather to fund a public improvement
designed to provide a long-term benefit to the city
and all its citizens. The revenue to be derived from
the charge is clearly in excess of the direct and indi-
rect costs of actually using the storm water system
over the next thirty years and, being thus dispropor-
tionate to the costs of the services provided and the
benefits rendered, constitutes a tax. See *Merrelli v St
Clair Shores*, 355 Mich 575, 585-588; 96 NW2d 144
(1959).

I do not believe that the capital investment compo-
nent of a true fee may be designed to amortize such
an expense, and to enable the city to fully recoup its
investment, in a period significantly shorter than the
actual useful service life of the particular public
improvement. This fundamental principle of basic
accountancy guides public utility regulators, *Ass'n of
Businesses Advocating Tariff Equity v Public Ser-
vice Comm*, 208 Mich App 248, 261; 527 NW2d 533
(1994) ("[c]onceptually, ratepayers are charged for
the amortization expense when it occurs and, there-
fore, rates coincide with the expense and are not ret-
roactive"), as well as tax assessors, *Consumers*

*Power Co v Big Prairie Twp*, 81 Mich App 120, 133-135; 265 NW2d 182 (1978). It ought to apply equally here.

This is not to say that a city can never implement a storm water or sewer charge without running afoul of art 9, § 31. A proper fee must reflect the bestowal of a corresponding benefit on the person paying the charge, which benefit is not generally shared by other members of society. *Nat'l Cable Television Ass'n v United States & Federal Communications Comm*, 415 US 336, 340-342; 94 S Ct 1146; 39 L Ed 2d 370 (1974). Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax. See *Ripperger v Grand Rapids*, 338 Mich 682, 686-687; 62 NW2d 585 (1954).

The majority concludes that *Ripperger* is dispositive of the present case. It states that *Ripperger* held that sewerage disposal charges constitute a user fee. But *Ripperger*, a case that preceded the Headlee Amendment by twenty-four years, addressed only the particular sewerage charges before it; it did not hold that all sewerage disposal charges, whatever their details, would constitute a user fee. In *Ripperger*, *supra* at 686, the Court cited authority finding that charges for water service did not constitute a tax and concluded that the same reasoning applied to the sewerage charges before it. Among the rationales for holding water charges not to be a tax were that the charges were metered and constituted the price paid

for a commodity and that consumers could voluntarily choose whether to use the service. *Id.* However, the charges under Ordinance 925 meet neither of these criteria. The charges at issue constitute an investment in infrastructure and therefore are not simply the price paid for a commodity. Further, they are not calibrated and, as discussed below, property owners cannot voluntarily choose in any meaningful sense whether to use Ordinance 925's service. Accordingly, even under *Ripperger*—quite apart from under the Michigan Constitution as amended a quarter of a century after *Ripperger*—the charges at issue would not constitute a legitimate user fee.

The manner in which the storm water charge is secured is relevant to whether it is a disguised tax. Where a charge is reasonably related to the incremental cost of the governmental service furnished, the fact that such a charge is secured by the imposition of a lien on property does not transform an otherwise proper fee into a tax. See *Jones v Bd of Water Comm'rs of Detroit*, 34 Mich 273, 275 (1876). But having established that the charges exacted from property owners are disproportionate to the incremental costs here, enforcement of the charge through a lien on property, administered by the tax assessor's office, buttresses the contention that the storm water charge is a tax in disguise.[4] It is also significant that the city chose not to have the program administered by the

---

[4] Chapter 1043.10 of the Ordinances of the City of Lansing, added by Ordinance 925, specifies: "Unpaid stormwater service charges shall constitute a lien against the property affected from the date the charges were incurred. [Unpaid charges] may, by resolution of the City Council, be certified to the City Assessor who shall place the charges on the next City tax roll."

Board of Water & Light, which generally administers the utility programs of the city.

A related failing of Ordinance 925 is that the charges do not correspond to the benefits conferred. Property owners already served by a fully bifurcated storm and sanitary sewer system are charged the same amount as property owners who realize the full benefits of the new construction. The record indicates that approximately seventy to seventy-five percent of the property owners in the city already enjoy separated sanitary and storm water sewers, many of whom have paid for such separation by special assessments. This further demonstrates the disproportionality between the charges imposed and the benefits of the service rendered. When a governmentally imposed obligation exceeds any reasonable value of benefits conferred and subsidizes a general public benefit, it constitutes a tax, rather than a fee. *Nat'l Cable Television, supra* at 340-342.

Indeed, it would be difficult to argue that Ordinance 925 even constitutes a proper special assessment. " ' "The imposition of a charge on all property, real and personal, in a prescribed area, is a tax and not an assessment, although the purpose is to make a local improvement on a street or highway." ' " *St Joseph Twp v Municipal Finance Comm*, 351 Mich 524, 532; 88 NW2d 543 (1958), quoting *Blake v Metropolitan Chain Stores*, 247 Mich 73, 77; 225 NW 587 (1929), quoting 1 Cooley on Taxation (4th ed), § 31, pp 106-107. In contrast, a special assessment is a "specific levy designed to recover the costs of improvements that confer local and peculiar benefits upon property within a defined area." *Kadzban v Grandville*, 442 Mich 495, 500; 502 NW2d 299 (1993)

(GRIFFIN, J.); see also *Knott v Flint*, 363 Mich 483, 497-500; 109 NW2d 908 (1961). Where assessed property receives no special benefit in addition to that conferred upon the community as a whole, a special assessment is invalid, *Fluckey v Plymouth*, 358 Mich 447, 453; 100 NW2d 486 (1960), and akin to the taking of property without due process of law. *Dixon Rd Group v Novi*, 426 Mich 390, 402-403; 395 NW2d 211 (1986).

Here, the charge at issue applies generally to property owners, rather than being imposed only on property owners actually benefited. Nor is there any limitation of the charge to property owners within a limited geographical area as is typically the case with a fee. The lack of relationship between the charge imposed and the benefit derived by any individual parcel evidences that the city has failed to differentiate the beneficial special charges from the general benefits conferred to the public. Moreover, it being effectively conceded that many properties in the city are already served by a bifurcated sewer system, expansion of the system to serve other properties confers no benefit on the former group, results in no concomitant increase in the value of the land assessed, and consequently furnishes no basis even for a special assessment. See *Kadzban, supra* at 500-502 (GRIFFIN, J.).

The acknowledged goal of Ordinance 925 is to address environmental concerns. The amicus curiae brief of the Lansing Regional Chamber of Commerce states that the instant charge is "being imposed to pay for the costs the City will bear in providing for the environmentally safe collection and disposal of storm water, in compliance with the [Federal Water Pollu-

tion Control Act, 33 USC 1251 *et seq.*]" A cleaner
Grand River and the avoidance of federal environ-
mental discharge penalties benefits everyone in the
city in roughly equal measure, not only property own-
ers. The extent of any particularized benefit to prop-
erty owners is considerably outweighed by the gen-
eral benefit to the citizenry of Lansing as a whole in
the form of enhanced environmental quality. See *Nat'l
Cable Television, supra* at 341-342. When virtually
every person in a community is a "user" of a public
improvement, a municipal government's tactic of aug-
menting its budget by purporting to charge a "fee" for
the "service" rendered should be seen for what it is: a
subterfuge to evade constitutional limitations on its
power to raise taxes.

Not only does Ordinance 925 fail to distinguish
between property owners who benefit from the capi-
tal construction planned under the sewer project and
those who do not, but it fails to distinguish between
those responsible for greater and lesser levels of run-
off. Although it appears to allow a dispensation for
property owners who construct a water retention
facility that limits the flow of water into the storm
water system, or that enhances the quality of such
water, such a credit is limited to fifty percent of the
charge, irrespective of the effectiveness of such a
facility. Further, the credits are prospective only and
are not set forth by Ordinance 925 itself, but require
the future enactment of regulations by the city. Such
regulations had not yet been promulgated at the time
of oral argument.

Further, I do not find any element of the volition characteristic of a true "fee" here.[5] City ordinances mandate that all property owners connect to the sanitary sewer and it does not seem unreasonable to assume that Ordinance 925 will eventually be amended to impose the same requirement with respect to the newly separated storm sewer system. The use of such indispensable services cannot be considered a matter of choice when there is a municipal monopoly and mandate over them. The property owner wishing not to use the service, or to use another service, has no alternatives. The charge is effectively compulsory. The owner is unable to limit the amount of services used, except by relinquishing altogether the right to own property. In contending at oral argument that the city may charge for separated storm sewer "availability," counsel for the city has effectively acknowledged that any element of true voluntariness with respect to such charges is mere veneer.

Another factor supporting the conclusion that the charge is actually a tax is that the "storm water enterprise fund," responsible for the administration of the program, replaces the taxpayer-supported General Fund of Lansing for purposes of the storm water share of the combined sewer overflow program. According to the city's consultants, "[m]anagement of the stormwater infrastructure historically has been financed with general fund revenues from property and income taxes."

---

[5] The Headlee Blue Ribbon Commission Report, *supra*, § 5, p 29, states that "[p]ayment of a tax is compulsory by law; whereas payments of user fees are only compulsory for those who use the service, have the ability to choose how much of the service to use, and whether to use it at all."

I note also that Ordinance 925 provides for the beneficial treatment of charitable institutions. While such treatment may very well represent wise public policy, the promotion of such public policies is generally associated with a tax and not a genuine user fee based strictly upon use. By itself, such a factor may be relatively inconsequential in determining whether a charge is a tax or a fee, but in conjunction with the other circumstances here, I believe that the treatment of charitable institutions belies a legislative purpose to enact what truly is a tax.

Finally, I note a troubling logical implication of the majority opinion. Nothing in the majority's reasoning would prevent municipalities from supplementing existing tax revenues with police, fire, or a myriad of other "fees" on the ground that such services are disproportionately utilized by property owners. Such a characterization of new taxes as police "fees" or fire "fees" or park "fees" could erode altogether the Headlee Amendment. Cf. *United States v City of Huntington West Virginia*, 999 F2d 71, 74 (CA 4, 1993). During oral argument, counsel for the Lansing Regional Chamber of Commerce, which supported the ordinance, acknowledged that, if this charge passes constitutional muster, nothing would bar a local government unit from redefining any discrete—and previously tax-supported—government activity as a "service" for which a "fee" may be charged. This would effectively abrogate all Headlee limits on the power of taxation and, concomitantly, on government spending. While a system in which user "fees" are substituted for taxes may well be worth public consideration and debate, it is an issue that cannot be

considered without reference to the constitutional requirements of the Headlee Amendment.

What properly characterizes most public safety functions, such as core police and fire services, as being beyond the purview of governmental activity that might be subject to a user fee is that the benefits derived from these functions benefit the entire community generally. Not coincidentally, that is also what insulates public safety officials from potential tort liability under the gross negligence exception of the government immunity act, MCL 691.1407(2)(c); MSA 3.996(107)(2)(c); the negligent acts of public safety officials are considered to violate their duty to the public at large, rather than any duty to a particular individual. *White v Beasley*, 453 Mich 308; 552 NW2d 1 (1996) (discussing the public-duty doctrine). Similarly, criminal activities are investigated and prosecuted in the name of the "People," all of whom are considered to suffer harm from the commission of such activities, not in the names of individual victims. The preservation of public safety is a quintessential function that government provides to the community as a whole.

Environmental public works projects fit the same mold. These are governmental undertakings of community-wide application and benefit and are properly funded from general revenues. There is no significant element of regulation here. If there were, the storm water charge would be based, not merely on the amount of rainfall shed from a parcel of property as surface runoff, but additionally on the presence of pollutants on that parcel that contaminate such runoff and contribute to the need for treatment before discharge into navigable waters. Further, the regulatory

nature of the charge would be enhanced if consideration had been given to the location and grade of properties or if greater justification had been provided for the arguable but overly facile assumption that properties contribute to runoff as a direct function of their size. Although it is not the role of this Court to second-guess the premises of a regulatory system devised by local representatives, some closer relationship between the amount of runoff attributable to a particular property and its storm water charge is required before we should be prepared to equate the instant charges with regular utility charges associated with oil, gas, or water usage. While something significantly short of an individualized metering system might well be sufficient, the instant charges are simply too uncalibrated with the actual benefits derived by individual properties from the construction of the city's storm water project to constitute a true fee.

Through the Headlee Amendment, which is self-executing, *Durant v Dep't of Ed (On Second Remand)*, 186 Mich App 83, 96-97; 463 NW2d 461 (1990), remanded on other grounds 441 Mich 930 (1993), the Michigan Constitution imposes restraints on a municipality's powers of taxation. The notion of a constitution is that limits are set upon the power of government, including the Legislature, *Toy, ex rel Elliott v Voelker*, 273 Mich 205, 216; 262 NW 881 (1935), that cannot be altered by any branch of government, including the judiciary, *Stoliker v Bd of State Canvassers*, 359 Mich 65, 67; 101 NW2d 299 (1960), and that exert paramount authority over any contrary custom. *Dearborn Twp v Dearborn Twp Clerk*, 334 Mich 673, 681; 55 NW2d 201 (1952). The

construction given the Headlee Amendment by the majority

> forces the inescapable conclusion that the people have done a futile thing: they have voted themselves a constitutional protection good only until the next session of the legislature.

*　　*　　*

> . . . A constitutional limitation must be construed to effectuate, not to abolish, the protection sought by it to be afforded. [*Lockwood v Comm'r of Revenue*, 357 Mich 517, 554, 557; 98 NW2d 753 (1959).]

Constitutional requirements may not be avoided on grounds that compliance is difficult or momentarily not expedient. *Alan v Wayne Co*, 388 Mich 210, 282; 200 NW2d 628 (1972), reaffirmed 388 Mich 626; 202 NW2d 277 (1972). An overriding rule of constitutional construction requires that rights specifically reserved to the people be saved "against conceivable if not likely evasion or parry" and that such constitutional provisions should not be construed so "as to impede or defeat its generally understood ends when another construction thereof, equally concordant with the words and sense of that clause or section, will guard and enforce those ends." *Michigan Farm Bureau v Secretary of State*, 379 Mich 387, 393; 151 NW2d 797 (1967).[6]

---

[6] "If by one mode of interpretation the right must become shadowy and unsubstantial . . . and by another mode it will attain its just end and secure its manifest purpose, it would seem, upon principles of reasoning, absolutely irresistible, that the latter ought to prevail." *Id.* at 394, quoting *Prigg v Commonwealth of Pennsylvania*, 41 US (16 Pet) 539, 612; 10 L Ed 1060 (1842).

I decline to join the majority's opinion because, in my judgment, it will erode a constitutional provision enacted by "We, the People of the State of Michigan" and designed to protect their liberties by limiting the share of the people's resources that may be appropriated by the government without the direct consent of the governed. As a result of decisions such as this, the people, if they continue to hold this view, will be required to return to the constitutional drawing board in order to stay one step ahead of their governmental officials. The latter rather than the former have improperly prevailed in this case.